USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1522

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOHN R. PARSONS,

 Defendant, Appellant.
 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nathaniel M. Gorton, U.S. District Judge]

 ____________________

 Before

 Selya, Circuit Judge,

 Aldrich, Senior Circuit Judge,

 and Boudin, Circuit Judge.

 ____________________

 Michael A. Collora with whom Michael B. Galvin and Dwyer &
Collora, LLP were on brief for appellant.
 Pamela Merchant, Senior Trial Attorney, Criminal Division,
Department of Justice, with whom Donald K. Stern, United States
Attorney, and Mark D. Seltzer, Director, New England Bank Fraud
Task Force, were on brief for the United States.

 
 April 16, 1998
 
 
 
 
 
 BOUDIN, Circuit Judge. John R. Parsons was convicted of
one count of conspiracy to commit bank fraud, 18 U.S.C. 371,
1344, and 13 counts of bank fraud, 18 U.S.C. 1344, and now
appeals from his conviction and sentence. We set forth a brief
summary of the underlying events. Since Parsons challenges the
sufficiency of the evidence, we describe the facts in the light
most favorable to the verdict. United States v. Bergodere, 40 F.3d
512, 518 (1st Cir. 1994), cert. denied, 514 U.S. 1055 (1995).
 In spring 1987, Parsons and Robert Hakala agreed to build
an office building on a lot they owned on the Leominster/Lancaster
town line in Massachusetts. Parsons planned to handle financial
and leasing matters; Hakala, who ran Hakala Construction Corp., was
slated to do the construction. In May 1987, Parsons and Hakala
formed Quest Realty Trust as a vehicle to hold the land and own the
planned building.
 Financing was sought from First Service Bank for Savings,
a federally insured bank in Leominster headed by Clary William
Wester. Between May and September 1987, Quest Realty received
interim short-term loans from First Service so that it could
acquire the land and undertake the initial steps, pending a full-
scale construction loan. In August 1987, Hakala sold his interest
in Quest Realty to Parsons but continued as the builder.
 On September 30, 1987, the bank agreed to make a full-
scale loan to Quest Realty, now fully controlled by Parsons, for
$4.8 million. Some of this money was disbursed at once; but most
was held back and payments were made over the succeeding months. 
These subsequent payments were partly based upon "requisitions"
from Hakala attesting that work had been done and were partly ad
hoc payments directed by Wester. In the government's view, the
September 30th loan was procured by Parsons through fraud, and much
of the money was diverted by Parsons to improper uses.
 In February 1996, a grand jury charged Parsons with the
single count of conspiracy and the 13 counts of bank fraud already
mentioned; there were other counts in the indictment, but they were
later dismissed and so are irrelevant here. Wester, an alleged co-
conspirator in count 1, pled guilty in October 1996 to a conspiracy
charge substantially identical to the conspiracy charged here. He
had earlier been convicted of unrelated frauds in connection with
his operation of First Service. United States v. Wester, 90 F.3d
592 (1st Cir. 1996). Parsons was tried in a two-week jury trial in
November 1996.
 At trial the government sought to prove two different
schemes. The first scheme (counts 1-8), in which Wester was
supposedly a participant, involved the alleged diversion by Parsons
of seven specific amounts, totaling about $1.4 million, from the
bank's loan reserved for Quest Realty's use in constructing the
building. According to the government, the diversions occurred so
that Parsons could make either personal expenditures (e.g.,
purchase of a Florida condo) or other investments not authorized by
the loan documents (e.g., in a different development project not
approved by the bank).
 In the second alleged scheme (counts 9-14), the
government sought to show that Parsons, acting alone, had diverted
six additional sums, totaling just over $272,000. The government
charged that after the bank had paid money over to Quest Realty to
satisfy Hakala's requisitions, Parsons had in six cases short-
changed Hakala and withheld the balance in Quest Realty for his own
benefit. This, said the government, was contrary to the commitment
in the loan agreement that the bank's money would be paid out by
Quest Realty in accordance with the requisitions.
 On November 14, 1996, the jury convicted Parsons on all
14 counts. In March 1997, Parsons was sentenced to 37 months'
imprisonment, fined $70,000 and ordered to pay restitution in the
amount of the diversions (just over $1.6 million). Parsons's
appeal followed, challenging the sufficiency of the evidence on 10
of the 14 counts. Parsons also alleged several trial errors and
attacked his sentence. 
 On this appeal, Parsons's sufficiency-of-the-evidence
claims are not backed by detailed analysis of the record evidence
on individual counts. Instead, after some limited background on
each count in the fact section of his brief, Parsons's argument on
the alleged insufficiency of the evidence consists--in total--of
two pages on counts 2-8 and one page on counts 9-10. Effectively,
this amounts to a few sentences each for nine different, very
complex transactions. Parsons's approach frustrates any detailed
examination by us and largely forecloses his claims. U.S.
Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 595-97 (1st
Cir. 1993).
 Nevertheless, there are several themes in Parsons's
argument, primarily addressed to counts 2-8, that we will address
briefly. The first theme is Parsons's claim--seemingly accurate--
that there was very little direct evidence of a conspiracy between
Parsons and Wester to defraud the bank. Wester approved certain of
the payments charged in the indictment as diversions to Parsons,
but the government did not have solid evidence as to any benefit to
Wester, promised or received. Needless to say, this gap in proof
makes it less likely that Wester conspired.
 But the government did prove that Parsons and Wester had
an ongoing relationship embracing many loans; both had various
ventures outside the bank; and there was some admittedly vague
evidence of business associations between them extrinsic to the
bank. Since Wester did approve improper diversions and Parsons
took the money, it was not irrational for a jury--given the
relationship between them--to infer that they had agreed to the
diversions. The jury was not required to draw the inference but
was entitled to do so. Glasser v. United States, 315 U.S. 60, 80
(1942).
 A second related theme in Parsons's argument is that as
to those diversions known to Wester, Wester's "approval" of them
insulates Parsons, since Wester was in charge of the bank. The
"permission" of a co-conspirator is not much of a defense. SeeUnited States v. Sheahan, 31 F.3d 595, 600 (8th Cir. 1994). 
Further, the diversions were not debatable expenditures but
patently contrary to the Parsons's obligations under the loan. 
Lastly, Parsons's own attempts to conceal his misconduct make
nonsense of any suggestion that he believed that Wester had somehow
modified Parsons's obligations to the bank.
 The third and fourth themes in Parsons's argument are
that Parsons was unaware of his obligations under the loan
documents he signed and that any diversions to other uses were
inadvertent. These are improbable claims, in light of Parsons's
numerous diversions, their size, and his various efforts to conceal
his behavior and to shift blame to others (e.g., his accountant). 
In any event, these evidentiary arguments are not seriously
developed through discussions of the evidence, and need not be
pursued further, U.S. Healthcare, 986 F.2d at 595-97, with one
exception.
 Only with respect to count 9 does Parsons's brief offer
anything close to a significant attack on the evidence. Count 9
charged that Parsons diverted $50,000 from a May 1987 loan to Quest
Realty intended to reimburse Hakala Corp. for construction expenses
incurred, and that in papers connected to the September 30th
construction loan, Parsons represented that all money previously
distributed by the bank had gone to pay construction expenses. One
element of Parsons's argument is that Hakala was in charge of the
Quest Realty checkbook in May 1987 and therefore necessarily
approved the diversion. This is no answer because Parsons
benefitted from the diversion and later represented to the bank
that the money had been used properly.
 Parsons's strongest point is his argument that $25,000 of
the $50,000 allegedly diverted was indeed paid by Hakala to Parsons
out of the Quest account, but for construction plans and an
architectural model. Whether this $25,000 was within the
conditions of the loan was the subject of conflicting evidence and
inferences at the trial. After studying the record, we think that
the evidence was barely sufficient as to this $25,000. The
conviction on Count 9 is supported, in any event, by the diversion
of the other $25,000, for which no adequate explanation has been
provided.
 Parsons makes a different evidentiary attack on his count
10 conviction. Here, we are given a total of three sentences
addressing different claims of error, without citation to the
record. To the extent possible, we have considered the arguments
on the merits and find them unpersuasive. It is worth noting that
neither of the convictions on counts 9 or 10 appear to affect the
sentence of imprisonment, although they do add $50 each in special
assessments. U.S.S.G. 2F1.1, 5E4.3 (1987).
 Parsons's counsel are competent lawyers and possibly
intended their short and sporadic attacks on the sufficiency of the
evidence merely to awaken some disquiet in the court, perhaps as a
backdrop for technical claims of error that are more elaborately
developed. This may be sound strategy. But future litigants
should understand that underdeveloped or unsupported attacks on the
government's evidence in a complex case are almost hopeless. It is
counsel's job on appeal to mine the record and prove the alleged
error, not to offer suggestive hints and leave the rest of the work
to a busy court. United States v. Zannino, 895 F.2d 1, 17 (1st
Cir. 1990).
 Parsons's next argument, after his challenge to the
sufficiency of the evidence, attacks the district judge's decision
to exclude proffered testimony. On the last day of trial, the
defense called Richard Clark, an attorney who had worked for both
Parsons and First Service. Clark had helped Parsons purchase a
Florida condominium for Parsons's personal use, using funds from
First Service. The government charged in count 8 that the funds
were diverted from the Quest Realty construction loans.
 According to a proffer, Clark would have testified, if
allowed to do so, (first) that Wester had told Clark that the funds
for the condo were coming from a line of credit at the bank
available to Parsons, and (second) that Clark had then so advised
Parsons. The government objected that this was hearsay, that it
was intended as backdoor proof of the alleged line of credit, and
that Parsons had conspicuously failed to call Wester to confirm the
alleged line of credit. The district court heard argument, took a
proffer, and then excluded the testimony in question, although
Clark was allowed to testify on other aspects of the condo
purchase.
 In the calm of appellate review, it is clear to us that
Clark's second statement--what he said to Parsons--was not hearsay
if offered only to show Parsons's belief that the money came from
a line of credit apart from the construction loan. Fed. R. Evid.
801(C). (Clark's first statement--what Wester told Clark--would
still be hearsay as to the existence of a line of credit and would
not itself show Parsons's state of mind). And Parsons did say to
the district court several times that he was offering the evidence
to show Parsons's state of mind.
 No doubt the government believed that Parsons was trying
through the back door to show that he had a separate line of
credit. But the normal answer to that concern is a limiting
instruction, United States v. Bartelho, 129 F.3d 663, 668-69 (1st
Cir. 1997), unless it can be shown that the benefit of the
testimony is substantially outweighed by the risk of jury
confusion. Fed. R. Evid. 403. The latter claim would itself be a
stretch and, in any case, was not made at trial.
 The government's last ditch argument is that if error,
the exclusion was harmless. Here we agree. At first blush, the
excluded testimony, although brief, appears highly relevant. But
a moment's reflection suggests that it would not have been very
persuasive as to Parsons's state of mind, unless the jury also
believed that Parsons in fact had a line of credit or good reason
to believe he did--independent of Clark's statement. Substantial
lines of credit do not materialize out of thin air: there had to
be some groundwork laid to secure such credit.
 Parsons did offer evidence that he had other loans from
the bank. But we have examined what is cited in the record; and
the evidence that Parsons had an outstanding line of credit, in a
large amount, at the time of the diversion, is almost invisible. 
It is not surprising that the jury was unimpressed. Parsons chose
not to testify and did not call Wester, thus depriving himself of
the two witnesses best situated to say that such a line of credit
existed and was used for the loan.
 As to Clark, he was far from a reliable witness for the
defense on account of other links with Parsons that tended to make
Clark's testimony suspect. In addition, Parsons's accountant
testified that when he later asked Parsons about the use of Quest
Realty loan proceeds for the condo purchase, Parsons made no
mention of any line of credit but provided a quite different
explanation for use of the loan funds. All said and done, we deem
the exclusion error, but harmless.
 We turn next to two claims of error based upon refusals
to give jury instructions sought by Parsons. The first refused
instruction was meant to follow after an instruction by the court
advising that the complicity of bank insiders and their knowledge
of a fraud is not a defense to bank fraud and does not absolve the
defendant. Parsons does not object to this statement but to the
refusal to append to it the following:
 On the other hand, the mere fact that a First
 Service Bank officer or employee granted or
 facilitated loans does not, in and of itself,
 constitute bank fraud. If you find that First
 Service Bank officers or employees approved of
 the defendant's use of the proceeds in
 question without acting fraudulently, you may
 consider their approval in determining whether
 or not the defendant defrauded First Service
 Bank.
 
 Except for confusing innuendo ("facilitate," "in and of
itself"), the first sentence in the rejected instruction is a
pointless banality: making loans is what banks do. The second
sentence is misleading: a non-fraudulent approval by a bank officer
or employee could easily be based on inadequate disclosure by
Parsons. Despite the "may consider" qualification, the language
tended to equate approval with exculpation, was misleading, and was
properly refused.
 Parsons's second refused instruction stated, in relevant
part, that in assessing Parsons's state of mind the jury could
consider "whether Mr. Parsons ultimately paid the contractor for
the work performed on the building." The instruction was
apparently aimed at Parsons's belated payment--after Hakala had
discovered the scheme--of loan proceeds due to Hakala for work on
the building but withheld and diverted by Parsons. It is enough of
an answer to say that the district court properly charged the jury
on intent to defraud; and for obvious reasons the court is not
required to frame an instruction for each piece of evidence that
one side or the other would like to have emphasized. United Statesv. Camuti, 78 F.3d 738, 744 (1st Cir. 1996).
 Finally, Parsons says that the district court erred in
calculating his prison sentence and in ordering restitution; the
arguments involve a common premise--that Parsons should have been
given credit for a settlement that he reached with the FDIC as
receiver for First Service. We begin with the sentencing issue,
first describing the district court's calculation of the offense
level that determined the sentencing range.
 Parsons was sentenced under section 2F1.1 of the 1987
edition of the guidelines covering crimes of fraud. It provides
a base offense level of 6 with additional levels added (pursuant to
a table) to reflect the amount of "loss" inflicted by the crime. 
In this case, the probation officer reported that the loss to First
Service was a figure just over $3.2 million, reflecting Quest
Realty's unpaid loan balance less the amount recovered on the sale
of collateral.
 Favoring Parsons, the district court instead chose to use
$1.6 million as the "loss," reflecting the amounts that Parsons had
unlawfully diverted from the Quest Realty loan. Where justified,
this is expressly permitted by the guidelines: "The offender's
gross gain from committing the fraud is an alternative minimum
estimate of the loss." U.S.S.G. 2F1.1, commentary. At
sentencing, Parsons accepted this lesser figure as a starting point
but then asked for a further reduction on grounds of his settlement
with the FDIC.
 The district court refused the further reduction and
instead added to the base level the additional 9 levels that the
table prescribes for a $1.6 million loss. The court added 2 more
levels for more than minimal planning and 2 more for obstruction of
justice, adjustments not here challenged. U.S.S.G. 
2F1.1(b)(2)(A), 3C1.1. This produced a total offense level of 19,
and Parsons was sentenced within the resulting range to 37 months'
imprisonment, as well as to a fine and restitution.
 On appeal, Parsons argues that the district court had to
use loss rather than gain and that loss to the bank was zero
because it settled its claims with Parsons. The settlement was
reached in a civil suit between Parsons and the FDIC as receiver
for the bank. Parsons agreed to transfer the deed on the Quest
building to the FDIC, and each side gave up its own claims--the
bank for all balances due on the Quest Realty loan as well as other
loans made by First Service to Parsons (in all, exceeding $8
million) and Parsons for the bank's breach of its lease (made
between Wester and Parsons) on the new building constructed for
Quest Realty. 
 Parsons's argument begins with an application note
describing "loss" for a fraudulently obtained loan as "the amount
of the loan not repaid at the time the offense is discovered,
reduced by the amount the lending institution has recovered (or can
expect to recover) from any assets pledged to secure the loan." 
The application note was added in 1991, application note 7(b),
added by Amend. 393, U.S.S.G. App. C, at 211 (1997), but may
arguably be considered as clarification. He refers also to cases
implementing this formula, including a few precedents saying that
gain should not be used if loss is zero. United States v.
Chatterji, 46 F.3d 1336, 1342 (4th Cir. 1995); United States v.
Anderson, 45 F.3d 217, 221 (7th Cir. 1995).
 Loss is a proxy for the seriousness of the offense. A
loss of zero is presumptively wrong in this case, since it does not
even remotely approximate Parsons's wrongdoing. Further parsing of
the application-note formula Parsons quotes is unnecessary, because
the fraud guideline commentary has always provided that where the
intended loss is greater than the actual loss, the intended loss is
to be used. U.S.S.G. 2F1.1. On its face, Parsons's initial
diversion of $1.6 million in loan proceeds to personal use is an
intended loss.
 And given that $1.6 million was intentionally diverted,
the later settlement does not reduce Parsons's culpability. It was
made well after the fraud was known to persons like Hakala who
could report it. Nor does it help Parsons that the FDIC knew
little about the criminal behavior when it made the settlement; a
defrauder cannot purchase a shorter term by a belated return of the
proceeds when the fraud is in the course of unraveling. United
States v. Bennett, 37 F.3d 687, 695 (1st Cir. 1994). In short, the
guideline range was properly computed.
 A related but more difficult question concerns
restitution. The district court ordered Parsons to make
restitution to the government of the same $1.6 million that the
court had used as the loss for sentencing purposes. 18 U.S.C. 
3663 permits restitution to compensate a victim for losses. 
Parsons disputes the order on two different grounds: that it is
precluded by the FDIC's civil settlement with Parsons, and that
there is no adequate proof of any loss.
 Restitution is not generally appropriate when it would
represent double recovery by the victim. United States v. Manzer,
69 F.3d 222, 230 (8th Cir. 1995). However, the burden of
establishing this double payment is on the defendant. United
States v. Mmahat, 106 F.3d 89, 98 (5th Cir.), cert. denied, 118 S.
Ct. 136 (1997). In some cases, the nature of a settlement might
show that the victim had been compensated for the loss. Here,
however, we have no reason to conclude that the settlement
compensated the bank for the $1.6 million loss reflecting the funds
diverted from the Quest loan. 
 It is true that on one side of the equation, the bank's
professed loss of all outstanding bank loans involving Parsons,
less realized collateral, arguably had to encompass the smaller
amount actually diverted. But the $1.45 million that the FDIC
realized from the sale of the Quest building left unpaid $3.2
million in loans on the Quest project and about $4 million in loans
on other projects. What the FDIC received, over and above the
building, was Parsons's surrender of his own claim for $10 million
for the bank's failure to honor the lease with Quest Realty. 
 The FDIC accepted the settlement based on this $10
million claim (and it was only a claim) in ignorance of the fact
that Wester and Parsons, the co-signers of the lease, were criminal
co-conspirators in defrauding the bank. The settlement may have
been wise based on what the FDIC then knew. But a sentencing
court, with greater knowledge of what Parsons's lease claim was
worth, did not have to treat Parsons's surrender of the claim as
meaningful compensation that would make restitution a double
recovery.
 True, the FDIC itself had no legal claim against Parsons
after the settlement, since the FDIC gave him a general release. 
But this court has already held that a release by the victim does
not preclude or cap restitution of losses as part of criminal
sentencing in a case where there is no double recovery. United
States v. Savoie, 985 F.2d 612, 619 (1st Cir. 1993). In United
States v. Coleman, 997 F.2d 1101, 1106-07 (1993), the Fifth Circuit
took a contrary position and treated a settlement as a bar to a
restitution award, but our own view has support in United States v.
Cloud, 872 F.2d 846, 853-54 (9th Cir. 1989), and United States v.
Vetter, 895 F.2d 456, 459 (8th Cir. 1990).
 Parsons's alternative objection is more interesting. He
says that the diversion of loan proceeds to personal use was not
the cause in fact of any loss to the bank. His theory is that his
diversion to his own use was primarily of loan funds intended for
the contractor, the contractor was later paid off by Parsons and
completed the building, and therefore the loan collateral (i.e.,
the building) was unimpaired.
 However, Parsons did not merely divert funds after the
master loan; his fraud lay also in misrepresentations to secure the
loan. And very large losses to the bank--well in excess of $1.6
million--followed from a loan that likely would not have been made
if Parsons had told the truth about diversions of funds from the
smaller interim loans by the bank. Contrary to Parsons's position,
the link is not too attenuated to permit restitution. See United
States v. Vaknin, 112 F.3d 579, 586-90 (1st Cir. 1997).
 The use of the $1.6 million figure was almost certainly
generous to Parsons. At the same time, using funds actually
diverted avoided various problems (e.g., Judge Gorton's equitable
concern about later declines in property values and thus of the
collateral) that would have attended use of the much larger loss
figure proposed by the government. We think that the trial judge
used common sense in making what is, in a complex set of
transactions and possibilities, as much a judgment call as an
exercise in mathematics. 
 Affirmed.