**Nitin PARIKH, M.D.,**

v.

**FRANKLIN MEDICAL CENTER, et al.**

**Civil Action No. 95–30111–MAP.**

United States District Court,
D. Massachusetts.

Sept. 20, 1996.

---

John F. Rogers, Cain, Hibbard, Myers & Cook, Pittsfield, MA, for plaintiff.

Francis D. Dibble, Jr., Anita F. Sarro, Jerome M. Scully, Kelly A. McCarthy, Bulkley, Richardson & Gelinas, Springfield, MA, for Franklin Medical Center.

Diane H. Esser, David J. Singer, Esser, Singer, Eisenberg, Wainstein & Berlin, Greenfield, MA, for Sudershan Singla, M.D.

## MEMORANDUM REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

(Docket Nos. 43, 47 & 55)

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiff Nitin P. Parikh, M.D., has filed this action to enforce his exclusive right to practice anesthesiology at defendant Franklin Medical Center ("FMC"). In response, FMC and codefendant Sudershan Singla,

M.D., Dr. Parikh's former partner, have filed counterclaims against plaintiff, seeking, among other things, a declaration that the exclusive-dealing arrangement violates federal and state antitrust laws. Before the court are the parties cross-motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of producing evidence to support its claim or pointing to an absence of evidence to support the nonmoving party's claim. If the moving party meets this burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine issue for trial. The court must evaluate all the evidence in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

After oral argument the court proposed to counsel the employment of a variation of the usual summary judgment mechanism, sometimes available in non-jury cases. This variation permits the court to make findings and draw inferences as to certain disputed issues at the summary judgment stage, essentially in the role of a factfinder, where nothing further is expected to emerge at trial to change or amplify the record. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720, at 26 (2d ed. 1983). Here, all parties agreed to permit the court to act essentially as factfinder in weighing the submissions of the parties' two antitrust experts. Unfortunately, after carefully sifting through the experts' submissions, the court has concluded that it will be necessary to take testimony from these witnesses in order to address the disputes generated by their opinions intelligently. Accordingly, the court will adhere to the usual summary judgment analysis on these motions.

## III. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are as follows. Disputes are noted accordingly.

### A. Factual Background

#### 1. Franklin County and Franklin Medical Center

According to a 1995 report prepared by the Massachusetts Department of Public Health ("DPH"), Franklin County, located 95 miles west of Boston, is the most rural county in the Commonwealth of Massachusetts. Covering approximately 850 square miles and consisting of 26 towns, the county has a population of less than 88,000. In central Franklin County, the population center of the county, 26.1% of the population is living at or below 200% of poverty, 15% is 65 or older, and 8.4% receives AFDC benefits.

FMC is a 162–bed, acute-care community hospital located in Greenfield, Massachusetts. It is the only acute-care facility in Franklin County. The hospital is flanked by other community hospitals that offer the same range of medical services. Specifically, within 25 miles of FMC are Brattleboro Memorial Hospital, a 61–bed facility in Brattleboro, Vermont, Athol Memorial Hospital, a 49–bed facility in Athol, Massachusetts, and Cooley Dickinson Hospital, a 158–bed facility in Northampton, Massachusetts. North Adams Regional Hospital, with 134 beds, is located 28 miles west of Greenfield in North Adams, Massachusetts. At least three additional community hospitals are located within 45 minutes' driving time.

#### 2. Exclusive Contract

In or about April 1990, after FMC's only board-certified anesthesiologist had announced his retirement, the hospital began a search for a new director of anesthesia services. In its search, FMC sought to address staff concerns about the quality and consistency of anesthesia care at the hospital as well as the administrative efficiency of the anesthesia department. Dr. Parikh, a board-certified anesthesiologist, responded to the hospital's advertisement for a medical director of anesthesia services and, in August

1990, entered into an interim agreement with FMC for the provision of anesthesia services.

In December 1990, after extended negotiations between the parties, Dr. Parikh and FMC entered into an exclusive contract. According to the terms of the agreement, "in order to provide for the continuity and consistency necessary in order to insure a high quality of anesthesia services to patients and to insure adequate staffing of [FMC's] Anesthesia Department," the hospital would give Dr. Parikh the "exclusive right to practice anesthesiology at Franklin Medical Center" and "to select and appoint all future anesthesiologists and/or [certified registered nurse anesthetists] at Hospital, in conjunction with the President of the Hospital, in accordance with established credentialing criteria." The agreement also contained a "grandfather" provision, allowing two non-board-certified anesthesiologists, Peter Arches, M.D., and Edward Bueno, M.D., and a certified registered nurse anesthetist, Joann O'Shea, to continue practicing at FMC.

Dr. Parikh told the hospital that he would take the position provided that he received exclusive control over the administrative functions of the anesthesia department and some guarantee that "my family and I could count on Greenfield being our permanent home." Parikh Aff. ¶ 11. Harlan R. Smith, president of FMC, states that Dr. Parikh "was very concerned about the contract being terminated based on performance issues" and thus wanted "generous conditions around the terms of his agreement." Pl.'s L.R. 56.1 ¶ 29. Accordingly, the contract provided for a five-year term automatically renewable for successive five-year periods unless Dr. Parikh died, suffered a career-ending disability, or lost his license to practice medicine in Massachusetts. The agreement also provided for termination in the event of a material breach, but did not identify any specific performance standards.

In December 1990, Dr. Parikh was 38 years old. He expected his exclusive contract with FMC to last for the remainder of his medical career, or about 30 years.

### 3. Improvement of Anesthesia Department

In or about 1990, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), a hospital-accreditation organization, cited FMC's anesthesia department for multiple deficiencies. Upon his arrival at FMC in the fall of 1990, Dr. Parikh reorganized the department, implemented a variety of quality-assurance and patient-evaluation programs, and upgraded anesthesia systems and monitoring. These efforts paid off. In 1991, and again in 1994, JCAHO conducted citation-free reviews of FMC's anesthesia department.

### 4. Rejection of Doctor

In 1993, Dr. Parikh objected to the hospital's plans to allow Raymond Pierson, M.D., a staff physiatrist (a medical doctor specializing in physical medicine and physical therapy) at FMC, to perform epidural, nerve-block, and other pain-management procedures at the hospital. Dr. Parikh made his objections on the basis of the exclusivity provisions in his contract with FMC. Dr. Pierson did not receive the requested privileges, and Dr. Parikh admits that his objections played a role in that result.

### 5. Partnership

In early 1994, anticipating an increase in demand for anesthesia services at FMC, Dr. Parikh recruited another board-certified anesthesiologist, Dr. Singla, to work with him at the hospital. In June 1994, Drs. Parikh and Singla entered into a partnership agreement. The agreement gave Dr. Parikh full discretion over the collection of accounts payable, the administration of partnership banking accounts, and other day-to-day business activities. The agreement further provided that 10% of Dr. Singla's partnership income would be held in an escrow account and subject to forfeiture if Dr. Singla provided medical services in Franklin County outside the terms of the partnership agreement. Finally, Drs. Parikh and Singla agreed that upon termination of their partnership Dr. Singla would resign from the medical and dental staffs at FMC.

Dr. Singla began his practice at FMC in July 1994. Dr. Parikh first submitted partnership billings to his billing service in October 1994 and first distributed partnership income to Dr. Singla in February 1995.

On or about March 17, 1995, Dr. Parikh notified Dr. Singla that he intended to terminate their partnership. On March 23, Dr. Parikh notified FMC that Dr. Singla would be resigning his staff privileges at the hospital, as required by the partnership agreement, and that he expected FMC not to interfere with his exclusive right to practice anesthesiology at the hospital. Thereafter, on the advice of counsel, FMC informed Dr. Parikh that it would not prohibit Dr. Singla from practicing at the hospital.

On or about May 12, 1995, Dr. Parikh told FMC that he would not include Dr. Singla on any future anesthesia-service schedules. On May 15, FMC transferred Dr. Parikh's scheduling responsibilities to another doctor. Several months later, in August 1995, FMC notified Dr. Parikh that it would not renew his exclusive contract at the end of its initial term on December 31, 1995.

### 6. *Dr. Singla's Claims*

Dr. Singla claims that Dr. Parikh's total disregard of the partnership's finances and unreasonable professional demands has caused him great mental anguish. He states that Dr. Parikh never explained the terms of the proposed partnership or produced a working copy of the proposed agreement. According to Dr. Singla, he did not read the final agreement before signing it "because I had discontinued looking for a position elsewhere" and "there was no opportunity to discuss [the agreement]." Singla Aff. ¶ 10. Dr. Singla also claims that Dr. Parikh too harshly reprimanded him for holding a small celebration at the hospital after passing his board examination and engaged in an "oppressive pattern of questioning my every move, without explaining his expectations." *Id.* at ¶ 18.

In his defense, Dr. Parikh claims that he chose to terminate his partnership with Dr.

Singla because the anticipated increase in demand for anesthesia services at the hospital did not materialize and because he doubted Dr. Singla's "willingness to be candid" and "take appropriate direction." Parikh Aff. ¶ 27. He also states that he processed partnership billings in a manner more or less comparable to his pre-partnership practice.

### 7. *Proposed Partnership*

In early 1995, Drs. Arches, Bueno, and Parikh explored the possibility of consolidating their practices in order to secure preferred-provider arrangements with several HMOs. Between approximately March and August of 1995, Dr. Parikh spoke with the representatives of two HMOs and offered to lower the prices he normally charged for his services in exchange for preferred-provider status. As yet, neither the proposed partnership nor a preferred-provider arrangement has materialized.

### B. *Procedural Background*

Dr. Parikh filed this action in state court on May 12, 1995. Three days later, on May 15, FMC removed the case to this court.

Dr. Parikh's complaint seeks a declaration that his exclusive right to practice anesthesiology at FMC is enforceable (Count I) and alleges a violation of Mass.Gen.L. ch. 93A, § 11 (Count II).

In its counterclaim, FMC is seeking declarations that its contract with Dr. Parikh is an unlawful exclusive-dealing and tying arrangement in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, Mass.Gen.L. ch. 93, § 4, and Mass.Gen.L. ch. 93A §§ 2, 11 (Counts I and II), and declarations that the "resignation" clause in the partnership agreement between Drs. Parikh and Singla violates both federal and state antitrust laws and Mass.Gen.L. ch. 112, § 12X (Counts III and IV).[1]

Dr. Singla, whom FMC has joined as a codefendant, has also filed a counterclaim against Dr. Parikh. The first four counts are essentially identical to FMC's counterclaim.

---

1. FMC's counterclaim also alleges violations of § 3 of the Clayton Act, 15 U.S.C. § 14, and § 5 of the Federal Trade Commission Act, 15 U.S.C.

§ 45. The hospital now admits that these two laws are not directly implicated in this case.

Counts V and VI of the counterclaim allege Dr. Parikh's failure to perform various accounting and distribution duties under the partnership agreement and intentional infliction of emotional distress. In addition, Dr. Singla has filed a crossclaim against FMC, seeking, among other things, a declaration that FMC's exclusive-dealing arrangement with Dr. Parikh violates § 1 of the Sherman Act and § 4 of chapter 93 (Count I).

Dr. Parikh has moved for summary judgment on Count I of his complaint, on all four counts of FMC's counterclaim, and Counts I through IV and VI of Dr. Singla's counterclaim. FMC has filed a motion for summary judgment on both counts of Dr. Parikh's complaint and Counts I, III, and IV of its counterclaim. Finally, Dr. Singla has moved for summary judgment on Counts I, III, and IV of his counterclaim and Count I of his crossclaim.

## IV. *DISCUSSION*

### A. *Exclusive–Dealing Arrangement*

FMC and Dr. Singla first claim that, even viewing the facts in the light most favorable to plaintiff, Dr. Parikh's agreement to supply anesthesia services to FMC amounts to unreasonable "exclusive dealing" in violation of § 1 of the Sherman Act, § 4 of chapter 93, and § 2 of chapter 93A. The court will begin with an analysis of defendants' Sherman Act and chapter 93 claims.

#### 1. *Sherman Act and Chapter 93*

■ The law of exclusive dealing operates on the theory that competition may be injured through foreclosure of rivals when a firm integrates vertically by contract. The primary inquiry, therefore, is whether an exclusive arrangement "ties up" a substantial amount of supply or outlet capacity and unreasonably hampers competitors from accessing the foreclosed market. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Standard Oil Co. of California v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

Given the potential harms and benefits to competition flowing from vertical agreements, including exclusive-dealing arrange-

ments, courts generally apply a rule of reason in deciding whether a particular agreement violates § 1 of the Sherman Act or § 4 of chapter 93. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977); *Winter Hill Frozen Foods and Services, Inc. v. Haagen–Dazs Co., Inc.*, 691 F.Supp. 539, 543 n. 5 (D.Mass.1988) (§ 4 of chapter 93 to be construed in harmony with § 1 of the Sherman Act).

■ a. *"Quick Look."* FMC and Dr. Singla preliminarily contend that the undisputed facts show the contract's direct anticompetitive effects, thereby eliminating the need for an extended rule-of-reason analysis. *See F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 2018–19, 90 L.Ed.2d 445 (1986). As a general rule, exclusive arrangements are not easily susceptible to this sort of "quick look" condemnation. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 595 (1st Cir.1993). And on these facts, certainly, no reasonable factfinder could conclude on the basis of a cursory glance that this exclusive arrangement has generated any direct harm to competition.

The court will address defendants' arguments briefly. First, FMC and Dr. Singla argue that Dr. Parikh's objection to Dr. Pierson's request for certain staff privileges has resulted in a reduced supply of anesthesia-related services at the hospital. There is no evidence, however, to suggest that Dr. Parikh was directly responsible for Dr. Pierson's failure to receive these staff privileges, only that he opposed the privileges on the basis of his contract and that, possibly in part for that reason and possibly for other reasons as well, the hospital chose not to extend them. Defendants next argue that Dr. Parikh's revocation of Dr. Singla's staff privileges has reduced the supply of anesthesia services at the hospital. The evidence also suggests, however, that FMC did not require an additional anesthesiologist on staff given the smaller than expected demand for anesthesia services in 1995. Finally, defendants charge that Dr. Parikh's offer to lower his fees in exchange for preferred-provider status with two HMOs is "very powerful evidence" of his

supracompetitive prices at FMC. But it is entirely possible, and defendants do not dispute, that Dr. Parikh could have realized efficiencies in these other arrangements that would have offset any reduction in price.

b. *Market Analysis.* In the absence of any direct evidence of competitive harm, the court must apply a rule of reason. In *Tampa,* the Supreme Court let stand a coal supplier's contract to supply an electric utility's coal requirements for twenty years against a challenge brought under § 3 of the Clayton Act. Standing in marked contrast to an earlier exclusive-dealing decision focusing almost exclusively on the *amount* of foreclosure in the relevant market, *see Standard Stations,* 337 U.S. at 314, 69 S.Ct. at 1062, the *Tampa* Court engaged in a wide-ranging inquiry into the structure of the relevant market, the amount of foreclosure, and its probable effects. 365 U.S. at 330–35, 81 S.Ct. at 629–32. Thus, *Tampa's* challenge is to consider all the relevant market data and discern their competitive significance.

*U.S. Healthcare* offers some guidance to courts preparing to embark on this sort of inquiry. In that case, which involved an exclusive-dealing clause in service agreements between doctors and an HMO, the First Circuit held, per Judge Boudin, that the antitrust claimant's "essential basis under *Tampa* for an attack on an exclusivity clause" is "proof of substantial foreclosure and of probable immediate and future effects." 986 F.2d at 596–97 (internal quotation marks omitted). Judge Boudin identified at least three factors relevant to the foreclosure analysis: the extent of foreclosure in the relevant market, the duration of exclusivity, and the incentives to remain in exclusive status. *Id.* at 595–96. With respect to the consequences of foreclosure, Judge Boudin also stressed three considerations: the motives for the contract, the competitive harms and benefits of exclusivity, and the availability and feasibility of any less restrictive means. *Id.* at 596–97.

The court will now turn to the core of defendants' burden on these claims: proof of substantial foreclosure and of probable and immediate future anticompetitive effects.

■ c. *Foreclosure.* First of all, defendants must define the relevant market by outlining "the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." *Home Placement Service, Inc. v. Providence Journal Co.,* 682 F.2d 274, 280 (1st Cir.1982) (citation and internal quotation marks omitted). The relevant market is typically broken down into its "product" and "geography" components. The court will examine these separately.

Plaintiff's expert, David M. Eisenstadt, Ph. D., and defendants' expert, Ralph M. Bradburd, Ph.D., generally agree that the relevant product market is anesthesia services provided at community hospitals. They disagree, however, about what services should be included in that broad definition. Dr. Eisenstadt would include all anesthesia services *except* those purchased with Medicare or Medicaid insurance. Dr. Bradburd, on the other hand, would include all anesthesia services *except* those he defines as tertiary care—*i.e.,* complex procedures performed more than 75% of the time at hospitals other than FMC.

■ Even viewing the facts in the light most favorable to Dr. Parikh, the court must find that the relevant product market is anesthesia services at community hospitals as defined by FMC's expert Dr. Bradburd. First, the product market should include anesthesia services covered by Medicare or Medicaid insurance. Contrary to Dr. Eisenstadt's assumptions, a doctor or hospital can overcharge a government payor. An inefficient health-care provider is as likely, perhaps even more likely, to generate high bills as an expensive one. Thus, even a government payor (generally paying a fixed fee for services) cannot escape the costs of inefficiency and incompetence. Next, Dr. Bradburd appropriately limited the product market to those services *regularly* provided at community hospitals. Complex surgical procedures performed more than 75% of the time at tertiary-care hospitals do not fall into this

category. A true picture of the product market requires this minor excision.[2]

■ Defining the relevant geographic market is a somewhat more difficult matter. The relevant geographic market is "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir.1996) (citation and internal quotation marks omitted). To ascertain this area, "evidence of current market behavior must be viewed in a 'dynamic' framework that considers the possible competitive responses of firms outside the current market area to anticompetitive behavior of firms within." *In re Hospital Corp. of America*, 106 F.T.C. 361, 466 (1985), *aff'd*, 807 F.2d 1381 (7th Cir.1986).

■ Dr. Bradburd defined the relevant geographic market to include all of Franklin County and two Worcester County border towns, an area from which FMC drew 96.4% of its patients in 1994. He then relied on various demographic reports to characterize Franklin County's residents as geographically, socially, and economically isolated and, therefore, unlikely to travel long distances for their medical care. He also noted that the high costs for hospital construction and existing state regulations prohibiting the construction of outpatient surgical centers in FMC's so-called "primary market area" (generally speaking, the area from which FMC drew 75% of its patients in 1994) constitute significant barriers to entry, further protecting FMC's present market share.

What is missing from Dr. Bradburd's report is a rigorous analysis of FMC's ability to increase its prices, decrease its supply, or otherwise deliver inferior anesthesia services without losing customers to alternative suppliers outside its present service area. *Coastal Fuels*, 79 F.3d at 196; *In re Hospital Corp. of America*, 106 F.T.C. at 466. Dr. Bradburd has cited some indirect evidence to

conclude rather speculatively that Franklin County residents will not travel very far for their medical care and that high barriers to entry protect FMC from extensive competition in Franklin County. But without some direct evidence that Franklin County residents are in fact unable or unlikely to switch to alternative providers outside the county, especially with so many providers in relatively close proximity to FMC, this court is unwilling to adopt Dr. Bradburd's conclusion that the hospital's present service area also constitutes the relevant geographic market for antitrust purposes. *See Drs. Steuer & Latham, P.A. v. National Medical Enterprises, Inc.*, 672 F.Supp. 1489, 1511 (D.S.C. 1987) (" '[D]ynamic' analysis hinges on the adducing of evidence of elasticity of demand *and* barriers to entry. In the absence of such evidence, it is simply not possible to infer whether a service area constitutes a geographic market for antitrust purposes.") (emphasis added).

Moreover, as Dr. Parikh points out, Dr. Bradburd has failed to address reports generated by Baystate Health Systems, FMC's parent company, which tend to show fluctuations in FMC's market share of various medical services within its "primary service area," an area roughly corresponding to the state-regulated "primary market area" described above. For example, in one particularly bad year, FMC's market share of "inpatient general surgery" in its primary service area dropped approximately 17%.[3] This evidence suggests that some number of FMC's patients can and do turn to other hospitals for their medical care.

Dr. Eisenstadt's depiction of the relevant geographic market is no more persuasive than Dr. Bradburd's. His proposed geographic market, derived from his application of the so-called 75/75 Elzinga–Hogarty test, comprises a patchwork of western Massachusetts communities scattered between the Vermont and Connecticut borders. The Elzinga–Hogarty test generally defines the relevant geographic market to be the area from

---

**2.** In reaching this conclusion the court is not finding facts. No reasonable factfinder could accept the definition of the relevant product market offered by Dr. Eisenstadt.

**3.** "Inpatient general surgery" is only one category of the larger product market; thus, FMC's overall market share did not necessarily fall 17%.

which few patients leave, and to which few patients enter, to purchase goods or services. Specifically, when measured at the 75/75 level, the test describes the area in which 75% of resident consumers purchase goods or services from resident suppliers *and* 75% of resident suppliers sell goods or services to resident consumers. Despite its methodological consistency, a mechanical application of the test carries the danger of overstating or understating the geographic market. *See United States v. Rockford Memorial Corp.,* 717 F.Supp. 1251, 1267 n. 12 (N.D.Ill.1989). Moreover, the test does not squarely address the dynamic factors—elasticity of supply and demand, and barriers to entry—central to an effective market analysis.

A cursory review of Dr. Eisenstadt's results raises doubts about the test's reliability here. Applying the 75/75 Elzinga–Hogarty test, for instance, Dr. Eisenstadt concluded that FMC's competitors include hospitals situated in Springfield, Massachusetts, the region's largest city, about 40 miles from Greenfield. Stranger yet, Dr. Eisenstadt's application of the 90/90 Elzinga–Hogarty test, the preferred measure for antitrust analysis, *see id.* at 1267, predicts competition from anesthesia providers in Cape Cod and Martha's Vineyard. This is absurd.

Dr. Eisenstadt also maintains that FMC's share of the relevant market, whatever the precise amount, must be apportioned among Dr. Parikh and the hospital's "grandfathered" anesthesia providers in order to determine the contract's true foreclosure effect. As a preliminary observation, no party has offered any evidence to show what each anesthesia provider individually contributes to the overall supply of anesthesia services at FMC or how Dr. Parikh's status as a board-certified anesthesiologist may skew his market share with respect to certain surgeons or surgical procedures. In the face of these unknowns, the court cannot realistically divide FMC's market share among all of its anesthesia providers.

Even if such information were available, however, division of FMC's market share would not be appropriate here. To limit the antitrust analysis to Dr. Parikh's individual share of the market is to understate drastically the contract's market effects. As medical director of anesthesia services at FMC, Dr. Parikh must perform myriad administrative tasks—*e.g.,* recruiting, training, and supervising staff—which affect the price and quality of all anesthesia services at the hospital. Thus, the contract's competitive significance clearly transcends Dr. Parikh's direct provision of anesthesia services to patients at FMC. It necessarily extends to the entire hospital.

Moreover, Dr. Eisenstadt's summary judgment submission has not addressed other concerns influencing the contract's foreclosure effect. For instance, unlike other exclusive agreements of this sort, Dr. Parikh's contract runs *indefinitely* and provides for no limited notice of termination. *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 6, 104 S.Ct. 1551, 1555, 80 L.Ed.2d 2 (1984) (5–year term, terminable by either party); *Balaklaw v. Lovell,* 14 F.3d 793, 799 (2d Cir.1994) (3–year term, terminable on 180 days' notice); *Burnham Hospital,* 101 F.T.C. 991 (1983) (3–year term, terminable on 180 days' notice). Given these contractual terms of virtually unprecedented generosity and Dr. Parikh's intention to remain in exclusive status with FMC for the remainder of his professional career, FMC's present market share—apparently somewhere between the experts' estimates of 6.6% and 45.1%—may satisfy defendants' burden of demonstrating substantial foreclosure in the relevant market. *See Jefferson Parish,* 466 U.S. at 29–31, 104 S.Ct. at 1567–68 (market share of 30% sufficient to inquire into effects of exclusive contract on competition in relevant market).

In sum, the court concludes that, viewing the facts first in the light most favorable to Dr. Parikh, defendants have not met their burden of demonstrating substantial foreclosure in the relevant market, and that, turning to view the facts in the light most favorable to defendants, plaintiff has failed to expose fatal deficiencies in defendants' Sherman Act and chapter 93 counterclaims. Accordingly, the court will reserve judgment on the foreclosure issue so that the parties may conduct a robust examination of the experts at trial.

■ d. *Anticompetitive Effects.* Assuming that defendants can point to sufficient evidence to make a showing of foreclosure at trial, can they also meet their burden of showing "probable immediate and future effects?" In some cases, motives may offer a clue as to anticompetitive effects. *U.S. Healthcare,* 986 F.2d at 596. On these facts, it appears that FMC contracted with Dr. Parikh in order to secure a board-certified anesthesiologist capable of providing ready, quality care and of improving and maintaining the hospital's anesthesia department. Dr. Parikh, on the other hand, sought out this exclusive arrangement in order to assure himself a steady flow of business and a measure of control over his work environment. None of these aims necessarily reflect an anticompetitive spirit.

FMC and Dr. Singla nevertheless insist that Dr. Parikh has used the contract to raise the prices and reduce the supply of anesthesia services at FMC. As the court noted above, however, defendants' evidence of direct harm to competition is extremely weak. At this stage it appears that Dr. Parikh is an aggressive businessman who construes his contractual rights broadly and, if provoked, will defend them aggressively. Otherwise, the facts strongly suggest that Dr. Parikh has used his contract to effect substantial improvements at the hospital, not to reduce supply or raise prices. In any event, in light of the difficulties in discerning and interpreting motives, *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 232 (1st Cir. 1983), the court is not inclined to rely on any inferential evidence of Dr. Parikh's anticompetitive intent to condemn this exclusive agreement as a matter of law at the summary judgment stage.

The more pressing issue is the contract's probable market effects. Exclusive contracts like this one generally do promote procompetitive efficiencies for hospitals, including assured availability of anesthesia services, lowered costs through standardized procedures, improved supervision of staff, and better working relationships between staff and physicians. *See Burnham Hospital,* 101 F.T.C. at 993–94 (describing benefits of exclusivity). Without these efficiencies, there

would be no reason for hospitals to grant exclusive rights to doctors.

So why is FMC repenting its contract with Dr. Parikh? It advances two powerful reasons why this exclusive-dealing arrangement unreasonably restrains competition among anesthesia providers, both individual anesthetists and hospitals. First, there is the matter of the contract's duration. The agreement states that it will *automatically* renew itself for five-year terms or until Dr. Parikh loses his license, suffers a career-ending disability, or dies. The contract also provides for termination in the event of a material breach, but in the absence of any specific performance standards, this provision loses much of its significance. Barring the unexpected, therefore, the hospital can expect Dr. Parikh to exercise his exclusive rights at FMC for the remainder of his medical career, perhaps 30 years or more.

Second, the contract affords FMC *no* leverage for assuring quality performance from Dr. Parikh. It provides for no performance standards, no limited notice of termination, and no competitive bidding. Without these provisions, there is no guarantee that the hospital will continue to reap the rewards of exclusivity and whatever procompetitive advantages it may normally afford. In short, the contract effectively immunizes Dr. Parikh from any efficiency-enhancing pressures, leaving the hospital and its doctors and patients potentially to suffer higher prices, reduced supply, and lower quality.

This is, the court recognizes, an atypical antitrust scenario. Usually, the challenge to a exclusive deal comes from foreclosed competitors. Dr. Singla clearly falls into this category. However, assuming the market for anesthesiologists is a national one, he cannot fairly claim that this arrangement has unreasonably narrowed the range of hospitals or patients requiring his services. FMC's competitors, on the other hand, are not challenging the arrangement. They do not seem to believe that this exclusive agreement will hamper their ability to attract anesthesia providers. Rather, the challenge is coming from FMC itself, a party to the contract, possibly because it believes the arrangement unreasonably restricts its access

to Dr. Parikh's competitors, thereby damaging competition among hospitals and indirectly affecting consumers. *Cf. Tampa, supra* (coal supplier seeks to repudiate exclusive deal with electric utility).

Notwithstanding the odd posture of this case, the court finds real antitrust concerns to be present. Not only are doctors and hospitals not immune from the federal antitrust laws, *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 786–88, 95 S.Ct. 2004, 2013–14, 44 L.Ed.2d 572 (1975) (no "learned professions" exception to § 1), there is good reason to subject them and their business relationships to careful scrutiny since even a small market failure could spell disastrous results for patients. As the First Circuit has noted: "Competition remains an essential force in controlling costs and improving quality in health care. Courts are properly available to settle claims that one business device or another is unlawfully suppressing competition in this vital industry." *U.S. Healthcare,* 986 F.2d at 599.

Clearly FMC and Dr. Parikh could have negotiated a different contract, one that both ensured the procompetitive benefits of exclusivity and addressed Dr. Parikh's concerns about his professional independence and detrimental hospital staffing decisions. For example, the parties could have provided for periodic third-party reviews of Dr. Parikh's performance or periodic competitions for the contract. These measures, properly defined and applied, would work to improve price and quality, not threaten them, without slighting Dr. Parikh's hard-won achievements.[4]

In any event, taking the facts in the light most favorable to defendants, the court concludes that Dr. Parikh's course of conduct, coupled with the one-sided terms of his exclusive contract, *may* be shown to generate substantial anticompetitive foreclosure in the market for anesthesia services. On the record at this stage, however, it cannot be said that such a showing has been made as a matter of law.

---

**4.** It should be noted that this exclusive contract's harmful effects (if any) appear to arise from the agreement's latent anticompetitive potential and not Dr. Parikh's malicious motives. Dr. Parikh

### 2. *Chapter 93A*

The court will also deny the parties cross-motions for summary judgment on defendants' claims under Mass.Gen.L. ch. 93A, §§ 2, 11. Section 2 of chapter 93A prohibits "[u]nfair methods of competition … in the conduct of any trade or commerce" and directs courts to construe its terms in light of federal court interpretations of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 595, 321 N.E.2d 915 (1975). According to the Supreme Court, § 5 of the FTC Act may be used to ban conduct that infringes the spirit, or that constitutes an incipient violation, of the Sherman Act. *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244, 92 S.Ct. 898, 905, 31 L.Ed.2d 170 (1972). But without further clarification of the relevant market, the court cannot determine whether this exclusive-dealing arrangement falls within the broader proscriptive reach of § 5 of the FTC Act or § 2 of chapter 93A.

In sum, the court will deny plaintiff's and defendants' cross-motions for summary judgment on defendants' exclusive-dealing claims. The court will also deny the parties' cross-motions for summary judgment on Dr. Parikh's complaint.

### B. *Tying Arrangement*

Defendants next seek a declaration that the exclusive contract amounts to illegal "tying" under the Sherman Act and chapters 93 and 93A. The essence of an unlawful tying arrangement is that a seller has used its monopoly power over one product to force a buyer to purchase a second product. Tying arrangements thus "deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Here, defendants

---

cannot be blamed for driving a hard bargain; presumably FMC signed the contract with knowledge of its terms.

take the position that, given the terms of Dr. Parikh's exclusive contract, the hospital must force patients using its surgical services to take specific anesthesia services as well, exposing it to potential antitrust liability.

 Unlike other vertical agreements, the Supreme Court still classifies tying arrangements as illegal *per se. Jefferson Parish*, 466 U.S. at 9, 104 S.Ct. at 1556. At the same time, however, the Court has "breathe[d] life into the screening function" of several preconditions to *per se* illegality. *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 796 (1st Cir.1988). Specifically, a tie-in will be deemed illegal *per se* if (1) the tie links two separate products, (2) the seller has market power in the tying product, and (3) the tie forecloses a "not insubstantial" amount of potential sales of the tied product. *Id.* at 794. This odd amalgam—three fact-intensive preconditions and a *per se* rule—has prompted the First Circuit to characterize tie-ins as "quasi" *per se* offenses. *U.S. Healthcare*, 986 F.2d at 593 n. 2.

Dr. Parikh contends that defendants cannot prevail on their tying claims because they have not shown that FMC derived any economic benefit from Dr. Parikh's sale of anesthesia services. FMC and Dr. Singla respond that under First Circuit law there is no requirement that the tying entity receive an economic benefit from the tie-in. These arguments raise the question whether the tying entity's economic interest in the tied product market is or should be a fourth precondition of *per se* illegality.

As a preliminary observation, all of the Supreme Court's major cases in this area concern entities with direct economic interests in two markets. *See, e.g., Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (photocopier manufacturer ties use of its service to sale of replacement parts); *Jefferson Parish, supra* (hospital ties use of anesthesia services to surgical services; hospital shares anesthetists' fees); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (company ties purchase of its prefabricated houses to preferred credit terms); *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) (motion-picture company ties licenses to unwanted or inferior feature films to licenses to sought-after films); *Northern Pac. Ry., supra* (railroad ties use of its rails to sales and leases of its land holdings); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (salt producer ties its salt to lease of its salt-processing machines); *International Business Machines Corp. v. United States*, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (business machine manufacturers tie use of their tabulating cards to leases of their business machines).

Not surprisingly, therefore, most circuits require an alleged tying offender to have an economic interest in the tied product market. *See Venzie Corp. v. U.S. Mineral Products Co., Inc.*, 521 F.2d 1309, 1317–18 (3rd Cir. 1975); *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104 (4th Cir.1987); *Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 456 (5th Cir.1979); *Beard v. Parkview Hosp.*, 912 F.2d 138, 144 (6th Cir.1990); *Carl Sandburg Village Condo. Ass'n No. 1 v. First Condo. Development Co.*, 758 F.2d 203, 207–08 (7th Cir.1985); *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476, 1479 (9th Cir.1983); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 712 (11th Cir. 1984). Only the Second Circuit has directly questioned the necessity of the tying entity's economic interest in the tied product market. *Gonzalez v. St. Margaret's House Housing Development Fund Corp.*, 880 F.2d 1514, 1517 (2d Cir.1989).

 The weight of authority thus suggests that an essential element of an unlawful tying arrangement is the antitrust defendant's extension of its economic muscle from one market to another. If defendants are correct, and the tying entity needs no economic interest in the tied product market, then tie-ins as a whole lose their unique characteristic: *one* entity seeks to achieve monopoly power in *two* markets. Presumably this is why these vertical arrangements are now subject to a "quasi" *per se* rule. In any event, in order to maintain the distinction between tie-ins and other vertical agreements, this court holds that § 1 of the Sher-

man Act and § 4 of chapter 93 require the tying entity to have an economic interest in the tied product market.

There is no evidence showing that FMC ever acquired a direct economic interest in Dr. Parikh's anesthesia services. On the contrary, the undisputed evidence shows that Dr. Parikh did not split his fees with, pay a commission to, or otherwise confer a direct economic benefit on the hospital. Moreover, defendants make no argument that § 5 of the FTC Act or § 2 of chapter 93A obviate the need to show the tying entity's economic interest in the tied product market, and this court is unwilling to distort the tying concept to make it fall within the reach of these statutes. Accordingly, judgment will enter in favor of Dr. Parikh on Count II of FMC's counterclaim and Count II of Dr. Singla's counterclaim.

## C. *Non-competition Clauses*

All parties have moved for summary judgment on defendants' claims against the non-competition provisions in Drs. Parikh and Singla's partnership agreement. Those claims allege that the so-called "forfeiture for competition" and "resignation" clauses in the partnership agreement violate Mass.Gen.L. ch. 112, § 12X. That statute provides in relevant part:

Any contract or agreement which creates or establishes the terms of a partnership, employment, or any other form of professional relationship with a physician registered to practice medicine ... which includes any restriction of the right of such physician to practice medicine in any geographic area for any period of time after the termination of such partnership, employment or professional relationship shall be void and unenforceable with respect to said restriction[.]

To review, the "forfeiture" clause provides that Dr. Singla must forfeit 10% of his partnership income to Dr. Parikh if Dr. Singla provides medical services in Franklin County outside the scope of the partnership agreement. The "resignation" clause provides that Dr. Singla must resign his staff privileges at FMC in the event of the partnership's termination.

Dr. Singla relies on *Falmouth Ob–Gyn Associates, Inc. v. Abisla,* 417 Mass. 176, 629 N.E.2d 291 (1994), for support. In that case, the Supreme Judicial Court held that § 12X "prohibits the imposition of a covenant not to compete on a physician who leaves an established practice." *Id.* at 178, 629 N.E.2d 291. The court further held that a "compensation for competition" clause—a close cousin of the "forfeiture" clause here—fell within the statute's proscriptive reach. It explained: "[A]n agreement requiring forfeiture of deferred compensation (or, as in this case, requiring compensation in the form of liquidated damages) if a former employee competes with his former employer imposes the same inhibitory effect on present and former employees as does an agreement absolutely barring competition by a former employee." *Id.* at 180 (citations and internal quotations marks omitted).

The same principle applies here. The "forfeiture" and "resignation" clauses in the partnership agreement clearly produce, individually and collectively, an "inhibitory effect" similar to "compensation" clause in *Ob–Gyn Associates.* In fine, whether the agreement demands compensation or shuts off a future source of income for choosing to compete, it clearly transgresses § 12X's policy of putting public choice over freedom of contract. *See id.* at 182, 629 N.E.2d 291.

Given this explicit finding, the court need not address defendants' separate claims that the "resignation" clause operates to restrain trade in violation of § 1 of the Sherman Act and chapters 93 and 93A. Suffice it to say, defendants would face an uphill battle proving that the clause substantially impairs competition in the relevant market since it only restricts one doctor's right to practice at a single hospital. *See U.S. Healthcare,* 986 F.2d at 597 (describing antitrust policy of protecting competition, not competitors, as "the ascendant view").

Moreover, in light of the uncertain legality of Dr. Parikh's exclusive contract with FMC, the court will withhold judgment on Dr. Parikh's claim that his contractual right to limit the extension of staff privileges at the hospital somehow validates the "resignation"

clause in his partnership agreement with Dr. Singla. At trial, therefore, the parties may need to address the question whether a doctor may escape § 12X's policy in favor of preserving competition between former partners by invoking his exclusionary rights under a lawful exclusive-dealing agreement.

In sum, the court will allow FMC's and Dr. Singla's motions for summary judgment, and deny Dr. Parikh's motion for summary judgment, on defendants' § 12X claims. The court will deny all the parties' motions for summary judgment as to Count III of FMC's counterclaim and Count III of Dr. Singla's counterclaim.

### D. *Intentional Infliction of Emotional Distress*

Dr. Parikh has moved for summary judgment on Dr. Singla's claim of intentional infliction of emotional distress. To succeed on this claim, Dr. Singla must show, among other things, that Dr. Parikh's conduct was "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976).

Even when viewed in the light most favorable to Dr. Singla, the evidence does not show the requisite degree of miscreancy for Dr. Singla to carry this claim to trial. Dr. Parikh's billing practices (certainly questionable and arguably tortious) and his professional demands (possibly unreasonable) do not rise to the level of being "utterly intolerable in a civilized community." In fact, the undisputed facts show that Dr. Singla must take some of the responsibility for this misguided joint venture. Remarkably, he did not even read the agreement or demand that Dr. Parikh explain its restrictive provisions before signing it.

The court does not question Dr. Singla's state of anxiety before, during, or after his partnership with Dr. Parikh. But Dr. Singla's emotional condition is not evidence of Dr. Parikh's outrageous conduct. Viewed in the light most favorable to Dr. Singla, the evidence shows that Dr. Parikh sought too much control over the partnership, making him, at worst, a very poor partner. On these facts, no reasonable factfinder could conclude that Dr. Parikh conducted himself "beyond all possible bounds of decency."

Judgment will enter in favor of Dr. Parikh on Count VI of Dr. Singla's counterclaim.

### V. *CONCLUSION*

For the foregoing reasons, the court will ALLOW plaintiff's motion for summary judgment as to Count II of FMC's counterclaim and Counts II and VI of Dr. Singla's counterclaim. The court also will ALLOW defendants' motions for summary judgment on Count IV of FMC's counterclaim and Count IV of Dr. Singla's counterclaim. The parties' motions otherwise will be DENIED.